# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **FELICIA ABRAM,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:15-cv-01027-RDP** |
| | } | |
| **VON MAUR, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

The court has before it Defendant's Motion for Summary Judgment (Doc. #28) filed on July 18, 2016.  The motion is fully briefed.  (Docs. #29, 32, 37, 39, 40).  Plaintiff Felicia Abram ("Plaintiff"/"Abram") claims she was the victim of both disparate treatment because of her race in violation of 42 U.S.C. § 1981 and Title VII (Count I) and retaliation in violation of those same statutes.  (Count II). Defendant Von Maur, Inc. ("Defendant"/"Von Maur") contends Plaintiff's claims fail because she cannot establish any of the following: (1) prima facie case of race discrimination or a showing of pretext for discrimination; (2) pattern or practice of race discrimination; or (3) prima facie case of retaliation or a showing of pretext for retaliation. After careful review, the court finds that the motion for summary judgment is due to be granted in its entirety.

I.      **Relevant Undisputed Facts**[1]

   A.  **The Von Maur Store**

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party – here, Plaintiff. *See Info Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

In many instances, when faced with a Rule 56 motion in an employment case, the court must analyze the business practices and structure of the employer to properly evaluate Plaintiff's claims. Von Maur is a family owned business that operates several upscale department stores, including a store at the Riverchase Galleria Mall in Hoover, Alabama which opened in November 2013. (Doc. #29, Exh. A at ¶ 2). Von Maur holds itself out as an Equal Employment Opportunity ("EEO") employer, and maintains policies against discrimination and retaliation. (Doc. #29, Exh. B at Exh. 9). Von Maur's EEO policies include a Remedy Procedure instructing employees as to the steps to take to report discrimination or other unlawful treatment, including a telephone number for contacting the Director of Human Resources if necessary. (*Id.*). Von Maur also maintains an Open Door Policy, stating that employees should "share ideas, concerns, and success." (*Id.* at 36; Doc. #29, Exh. A at Exh. 1). Plaintiff claims this Policy was not properly exercised at the Riverchase Galleria location because she didn't feel as comfortable talking to members of management "because the environment was not exactly the same" as the environment at the Von Maur store in Georgia at which she had previously worked. (Doc. #29, Exh. B at 37). Plaintiff did, however, receive copies of the EEO and Open Door Policies when she began working in Alabama. (*Id.* at Exh. 10).

Von Maur's stores include a Cosmetics Department, which is staffed by a Department Manager, Counter Managers, and Sales Associates. (Doc. #29, Exh. A at ¶ 3). The Cosmetics Department generates significant sales and revenue for Von Maur in comparison to other departments and is a critical component of the overall success of any particular store. (*Id.*, ¶ 4). Outside account executives for cosmetic brand lines, *i.e.* Estee Lauder and Clinique, work closely with Cosmetic Department employees. (*Id.*, ¶ 5). Sales Associates and Counter Managers duties are not limited to selling cosmetics; they are also required to develop and run their particular brand's business, demonstrate specific cosmetic knowledge, coordinate and

2

discriminate color schemes, create looks for customers, independently plan events, generate ideas on how to grow sales, and develop clientele.  (*Id.* at Exh. 2, Cosmetic Sales Associate Job Description).  Within that framework, the Cosmetics Department Manager's mission is "[t]o develop and motivate department associates [and] [t]o develop the department's sales growth by monitoring and improving the department's level of customer service and visual presentation." (*Id.* at Exh. 3, Cosmetics Department Manager Job Description).  To accomplish this mission, the Department Manager has a variety of job responsibilities.  On a typical day, a Department Manager: "observes, assists and motivates cosmetic associates in providing excellent customer service daily; sets an example for others to follow;" "[a]nalyzes problems and offers creative solutions;" "acts as a member of the department team, and projects a positive and friendly attitude;" and is "able to delegate work when necessary."  (*Id.*).  During the relevant time period, the Riverchase Cosmetics Department employed approximately fourteen different people, excluding Plaintiff.  (Doc. #29, Exh. C).

### B.  Plaintiff's Employment at Von Maur

Von Maur initially hired Plaintiff in January 2013 as a Cosmetic Department Sales Associate at its North Point Mall store in Alpharetta, Georgia.  (Doc. #29, Exh. B. at 26-27).  At the time of her hire, Keith Lockett, an African-American, managed the North Point store.  (*Id.* at 32-33; Doc. #29, Exh. A at ¶ 6).  In February 2013, Lockett approved a wage increase for Plaintiff based on her early performance as a Sales Associate, because he wanted to retain her. (Doc. #29, Exh. C at No. 5).  In April 2013, Plaintiff applied and interviewed for the open Cosmetics Department Manager position at North Point, and Von Maur promoted her to that position in early May 2013.  (Doc. #29, Exh. B at 2; Doc. #29, Exh. D at 137).

In July 2013, Von Maur began interviewing internal and external candidates for positions that would be available at Riverchase when the store opened in November 2013.  (Doc. #29,

Exh. D at 152-53, 155-56).  Plaintiff applied for the Cosmetics Department Manager position and interviewed with Regional Director George LaMark, Riverchase Store Manager Caitlin Harris, and Riverchase First Floor Manager Aileen Read.  (*Id.* at 140-43).  Based on her previous experience in cosmetics at Von Maur, and her interview performance, Von Maur selected Plaintiff for the open position, and believed she had strong potential to lead the department.  (*Id.* at 144; Doc. #29, Exh. B at 25-26; Doc. #29, Exh. A at Exh. 12).  Plaintiff began working at the Riverchase store on or about August 18, 2013.  (Doc. #32, Exh. 1).

### 1.  Plaintiff's Performance under Store Manager Caitlin Harris

Caitlin Harris worked as the Riverchase Store Manager from June 2013 until January 2014.[2]  (Doc. #29, Exh. E at 10).  During Harris's tenure as Store Manager, several Von Maur employees complained about Plaintiff's management style.  Lancôme Counter Manager Sarah Beth Brooks resigned with no notice on November 1, 2013, the day before the Riverchase store opened.  (Doc. #29, Exh. H at 43-47).  In her exit interview with Human Resource Manager James McIntosh, Brooks stated that Plaintiff made her feel uncomfortable, was very direct and too negative, did not provide adequate training, and failed to provide clear expectations.  (*Id.* at 43-47).  McIntosh sent Brooks' exit interview form to Read and Harris for their review.  (*Id.* at 47-48; Doc. #29, Exh. G at 53).  McIntosh has documentation that this issue was brought to Plaintiff's attention, particularly as it reflected Plaintiff's communication issues, the need to provide accurate information, and proper delegation.  (Doc. #29, Exh. F at Exh. 37; Doc. #29, Exh. E at 51).  Plaintiff denies having any such communication.  (Doc. #29, Exh. B at 367-69).

Caitlin Harris personally observed Plaintiff micromanaging her staff, including rearranging their stock, making them nervous about displaying product and refusing to allow them to independently obtain their sales numbers, which left Counter Managers in the dark

---

[2] In January 2014, Caitlin Harris was promoted to the position of Director of Store Integration.  (Doc. #29, Exh. E at 9).  She is now the Assistant Director of Human Resources.  (*Id.* at 6-7).

regarding sales performance.  (Doc. #29, Exh. E at 51).  Harris had associates come to ask her questions about their individual performance, which is information that Plaintiff, as Department Manager, was provided by the buying office.  (*Id.* at 56-57) ("[Plaintiff] was the only one who knew where [that information] was, but she didn't share that with anyone else.").  Sales associate Rosemary Goodwell resigned her position as Sales Associate, citing Plaintiff's management style as one reason.  (Doc. #29, Exh. H at 48-50).  Goodwell testified that Plaintiff created "an air of intimidation without saying anything" and that other Sales Associates "didn't particularly like her management style either."  (Doc. #29, Exh. I at 27, 32-33).  Goodwell stated that Plaintiff forbade Sales Associates from talking with each other, even if sales were slow on the floor.  She also stated that after the initial training, "we were just, more or less, left on our own."  (*Id.* at 19, 40).  As to Plaintiff's management style, Goodwell stated there was "no cohesion, and there was no team building," that "it just seemed like there was nothing done to cement everybody together," and the air was one of "keep them divided and conquer."  (*Id.* at 41-42).  Goodwell reported to Human Resource Manager McIntosh that Plaintiff micromanaged the department, failed to create and foster an atmosphere of teamwork, and rushed their training.  (Doc. #29, Exh. H at 50).

Harris and Read met with Plaintiff after Goodwell's resignation.  (Doc. #29, Exh. F at Exh. 37).  Documentation from that meeting indicates that Plaintiff was counseled regarding her communication and leadership, with examples given to Plaintiff "as to why Felicia needs to be aware of her verbal and nonverbal communication."  (*Id.*).  The same documentation indicates that Harris and Read spoke with Plaintiff about some additional employees voicing concerns, including that they were not permitted to make their own decisions and that they were spoken to as if they were new to cosmetics.  (*Id.*).  Plaintiff disputes that anything was mentioned about any employee other than Goodwell.  (Doc. #33, Exh. 21 at ¶ 5).  As to Goodwell, Plaintiff responds

that "Rosemary's complaints were very unfounded and that they hired the wrong individual for a job that she could not do; moreover, Rosemary left that job because she had not been disciplined for kicking me … That does not count as a previous conversation when you consider the facts." (Doc. #29, Exh. B at 367-69).  However, Plaintiff also admits that Harris and Read "told me that she quit because of me" and that "they said we talked to [Goodwell] and she said that you were micromanaging her and that she had not been trained."  (*Id.* at 80-81).  Plaintiff disagreed with the criticisms that were relayed to her by her superiors.  She drafted a rebuttal letter but did not send it because she says she feared retaliation.  (*Id.* at 115-16).

According to Harris, approximately one week after this discussion with Plaintiff following Goodwell's resignation, Harris received feedback from Kyle Earley, Defendant's African-American Riverchase Loss Prevention Manager, that Earley had overheard Plaintiff making negative comments about the store in front of other employees.  (Doc. #29, Exh. E at 41-44).  Although Harris recorded in documentation that she spoke to Plaintiff about this issue, Plaintiff denies that she made any negative comments about the store and disputes that Earley "made this complaint because he complained to me he felt Ms. Harris was racist.  He complained about Ms. Harris so much, it made me uncomfortable."  (Doc. #33, Exh. 21 at ¶ 6).

Finally, although there is no documentation that Plaintiff was counseled on or about December 4, 2013 regarding giving inaccurate information to Harris and Read about her subordinates' interests in certain opportunities within the store, there is documentation that Plaintiff was spoken to on that date regarding "how important it is to relay accurate information." (*Id.*, ¶ 7; Doc. #29, Exh. F at Exh. 37).

### 2.   Plaintiff's Performance under Store Manager Melissa Patton

In mid-January 2014, Harris left Riverchase and became Director of Store Integration at Von Maur's corporate headquarters in Iowa.  (Doc. #29, Exh. E at 9).  Approximately one month

later, on February 10, 2014, Melissa Patton became the Riverchase Store Manager.  (Doc. #29, Exh. F at 137).   Harris did not discuss Plaintiff or share her concerns about Plaintiff's performance with Patton before she left.   (Doc. #29, Exh. E at 39).   However, while Store Manager, Harris had discussed her concerns about Plaintiff's performance with her supervisor, Regional Director George LaMark, on several occasions.  (*Id.* at 45-46, 59-60; Doc. #29, Exh. D at 188).

Shortly after Patton started, Keith Lockett[3] made the decision to have First Floor Manager Aileen Read spend more time in cosmetics "because she needed to be down there to make sure things were running smoothly."  (Doc. #29, Exh. F at 259).   Patton was surprised by this decision because she believed that Plaintiff should have been capable of running the Department with minimal supervision by a floor manager.  (*Id.* at 258-59).   On Patton's first day as Store Manager, Plaintiff came to see her, complaining that Read was spending too much time in the Department and interfering with her responsibilities.  (*Id.* at 134-37).   Patton reported Plaintiff's complaint about Read to LaMark.  (*Id.* at 141).   Patton made her own observations about Read's involvement in the department.  (*Id.* at 145).   Read and Abram had different ideas about how to run the department.[4] (*Id.* at 149).

On March 7, 2014, Plaintiff received her annual review, which Read prepared and Patton approved.  (*Id.* at 107-08, 213).   Read rates Plaintiff with a "meets expectations" in all categories

---

[3] Lockett had been a Manager at the Alpharetta store with Plaintiff.  (Doc. #29, Exh. B at 32-33).   He worked at the Riverchase store directly with Plaintiff for one month, from approximately May 2013 to June 2013. (Doc. #29, Exh. K at 10).   He was then promoted to Director of Cosmetics and mostly interfaced with the Store Manager.  (Doc. #29, Exh. B at 35).   However, in November 2013 Lockett observed Plaintiff during a training session.  (Doc. #29, Exh. K at 48).   He recalls giving Plaintiff feedback, encouraging her to "tone it down" and "not be so direct."  (*Id.* at 48).

[4] According to Patton, Read coached Plaintiff on February 25, 2014, after discovering that Plaintiff had mocked a buyer's voice on the sales floor.  (Doc. #29, Exh. F at 151).   Patton did not witness this incident, however, and there is no documentation attesting to the fact that this incident or counseling occurred.   Therefore, the evidence is taken in the light most favorable to Plaintiff.   Plaintiff denies that she mocked a buyer's voice, affirms that she "would not do that," and states that no coaching was done.  (Doc. #33, Exh. 21 at ¶ 9).

except for department sales and attendance; in that category, she received a "not meeting expectations" rating.[5]  (Doc. #29, Exh. J at 30, 35, 36, 43, 48-52).  Specifically, Plaintiff had accrued twelve tardies and ten absences for the year.  (*Id.*, Exh. 4).  The review also lists communication, leadership, and taking positive action to build and maintain department morale as goals for Plaintiff.  (*Id.*).

Around the same time, three of Plaintiff's staff members, Lawrence, Lowe, and Milito, sought out Patton to complain about Plaintiff's inability to delegate, poor communication skills, and negativity.  (Doc. #29, Exh. F at 153-167).  Plaintiff denies that she was ever told that Lawrence, Lowe, and Militio had complained about her management style.  (Doc. #33, Exh. 21 at ¶ 12).

On March 16, 2014, Plaintiff talked to Patton about her interest in applying for a promotion to a First Floor Manager position at the North Point store in Alpharetta, Georgia. (Doc. #29, Exh. F at 153-67).  Because the Store Manager would have to approve Plaintiff for the promotion, Patton explained that she would need to see improvement in Plaintiff's communication before she could provide the endorsement.[6]  (*Id.* at 154).

Two days later, on March 18, 2014, Lowe again approached Patton, telling her that Plaintiff was spreading rumors about Lowe allegedly resigning, fought with Read (which left her

---

[5] Defendant contends that Von Maur has a practice of rating employees as "meets expectations" if they do not have a formal disciplinary warning in the areas addressed.  However, Defendant's policies, practices and training all direct that performance reviews are intended to gauge performance and keep employees aware of their performance level.  (Doc. #33, Exh. 8, Handbook Page; Doc. #33, Exh. 9, Performance Review Policy).  Manager Training also directs that an employee "must be performing the responsibilities defined in most bullets on the Rating Guide at the "Fully Meets Expectations" level to receive that rating."  (Doc. #33, Exh. 10, Training Materials, Session 6, p. 57).  The same training directs that even without a disciplinary warning, if "performance has recently been poor enough to receive a Disciplinary Warning at the time of the review, the associate will receive a "Does Not Meet Expectations" rating in the appropriate category."  (*Id.*).  This disagreement requires a credibility assessment. Therefore, for purposes of summary judgment, the court does not give any weight to the contention that Von Maur tends to inflate employee performance reviews.

[6] Patton alleges that during this meeting, she provided Plaintiff feedback on the complaints that she had received about Plaintiff's leadership from Lawrence, Lowe, and Milito.  (Doc. #29, Exh. F at 153-67).  Plaintiff disputes that Patton identified any problems associates were having with her.  (Doc. #33, Exh. 21 at ¶¶ 11-13; Doc. #29, Exh. B at 367-68).

unsure of her directional mandate), and had made the Clinique Counter Manager, Jessica Ruger, cry.  (*Id.*, Exhs. 37, 41).  Plaintiff denies that she spread rumors about Lowe or that she made Ruger cry, but she does not deny that Lowe made these complaints to Patton.  (Doc. #33, Exh. 21 at ¶ 13).  Around this time, Patton called Carol Proctor, an Estee Lauder account executive, to introduce herself as the new Store Manager.  (Doc. #29, Exh. F at 191-97).  Proctor declined Patton's invitations to meet, stating that Plaintiff's actions had soured her on Von Maur.  (*Id.* at 191-97) (testifying that "she did not want to meet with me because she was so upset with the way that Felicia [Abram] handled the department ….").

### 3.  The Termination of Plaintiff's Employment with Von Maur

Patton made the decision to terminate Plaintiff's employment on or around March 20, 2014.  (*Id.* at 201).  She testified that the decision was made:

> Because she [Abram] wasn't performing the expectations of the position.  After our coaching sessions and we had brought concerns to her attention, she wasn't improving that we needed her − she was negative.  She wasn't driving the business.  She had communication concerns.  Her leadership was ineffective.
>
> She wasn't able to manage her staff.  I had my floor manager down there helping.  We needed somebody in there that could steer the department in a positive, upward direction. It was getting worse, and counseling would not have helped that.

(*Id.* at 224-25).

Patton requested a meeting with LaMark and Lockett to discuss concerns she had about performance in the cosmetics department.  (*Id.* at 206).  The three discussed the department and department morale, and "the issues that we were continuing to have with [Plaintiff] and … the business in the department and that things were not improving."  (Doc. #29, Exh. D at 200). Lockett "provided some thoughts on some visits … as well as [his] thoughts on her [Plaintiff's] development."  (Doc. #29, Exh. K at 30, 44-45).  He recalled "having to give [Plaintiff] feedback after a training session that we had there at the store about just kind of toning it down, not being

so direct." (*Id.* at 48).  LaMark and Lockett supported Patton's decision to terminate Plaintiff's employment after "review[ing] her file … [since] the department was in really bad shape." (Doc. #29, Exh. D at 200).  LaMark testified that Plaintiff was terminated, as opposed to counseled, because "[w]e invested a lot of time as far as getting her to that point and, you know, we didn't want to have to counsel her … we wanted her to be successful and … it got to a point where the department was just – it was not in good shape, and we had to make a change." (*Id.* at 189, 228).  LaMark added to his testimony that "[i]t was a new store" and management felt that they had to take "quick action to make sure that [they were] doing what's best for the business." (*Id.* at 187-88).

Plaintiff's employment with Von Maur was terminated on March 25, 2014.  (Doc. #29, Exh. B at 15).  At the time of termination, Plaintiff did not state (or in any way suggest) that she felt she was being discriminated or retaliated against.  (*Id.* at 364-65).  Though Patton delivered her termination notice, Plaintiff was unaware of who made the decision to terminate her employment.  (*Id.* at 248).

### 4.  Post-Termination Events

A few days after the termination of her employment, Plaintiff dropped off a handwritten note, which stated that there had been "no previous conversations/write ups or warning of pending termination if no improvement had ever been discussed." (*Id.* at Exh. 5).  On March 28, 2014, Plaintiff called Jill Salmonson, Human Resources Manager, to say that she felt that she had been wrongfully terminated.  (Doc. #29, Exh. L at Exh. 1).  The typed notes from that call indicate that Plaintiff had problems with Caitlin Harris.  (*Id.* at Exh. 2).  "[Plaintiff] said she was accused of things she never said or did, or accusing her of things others have said or did. … [T]here are unfair practices that take place at that store … [Plaintiff] was never told that her team

wasn't happy and was never given a chance to make it better. … [Plaintiff] was also told they weren't happy with her numbers." (*Id.*).

After termination, Plaintiff also contacted Amy Rotert, Von Maur's Vice President of Stores and Loss Prevention. (Doc. #29, Exh. B at 373-75). During that conversation, Plaintiff discussed the fact that she and the Floor Manager did not work well together, and "went through and talked about additional people that were hired that she wasn't happy with." (Doc. #29, Exh. M at 26). In response, Rotert "pull[ed] out" the concerns and conducted a "broad scope of … investigation," determining "if there was an issue with the termination, whether that was retaliatory or if we had other issues or if we – if it was the right decision for them to make." (*Id.* at 30).

Plaintiff's vacated position remained open for about a month, at which time Patton considered two internal candidates for the job: Kristen Lowery (Caucasian) and Larissa Simpson (African American). (Doc. #29, Exh. F at 225-27). Patton selected Lowery, but also promoted Simpson to the Human Resources Assistant position at the same time. (*Id.*). Simpson is now an executive, Third Floor Manager, at the Galleria store. (*Id.* at 228).

### C.  Plaintiff's Complaints of Racially Unfair Treatment

At the end of February 2014, Read instructed Plaintiff to discipline Sales Associate Sandy Moore, African American, for "issues with attendance." (Doc. #29, Exh. B at 274-75). When Plaintiff reviewed the attendance records for other associates, she determined that Maria Milito, Caucasian, had a similar attendance record to Moore's, yet Read had not instructed Plaintiff to discipline Milito. (*Id.* at 274-75). Plaintiff thought this was a disparity and brought it to Patton's attention. (*Id.* at 274-75). Patton agreed that all employees who fell below specified standards were to be written up in the categories of their poor performance. (*Id.* at 276, 289-91). As a result, Plaintiff prepared discipline for all employees who fell below various standards;

however, she was not permitted to present those written disciplines to anyone other than Moore. (*Id.* at 276, 289-91). Plaintiff discussed this with Lockett, but Lockett informed Plaintiff that he knew of the decision to discipline Moore not for attendance, but for poor sales performance. (*Id.* at 281; Doc. #29, Exh. K at 60). Patton characterized Moore's performance as "fairly deficient" and "low." (Doc. #29, Exh. F at 123-24). Plaintiff had access to the sales performance records and was able to determine this was so; in fact, Plaintiff acknowledged that she knew that Moore was being disciplined for her sales performance. (Doc. #29, Exh. B at 273-81, 300). Plaintiff administered Moore's disciplinary warning. (*Id.* at 46-47, 122-24, 227-29). After the warning, Moore remained employed, with her benefits intact; however, verbal or written warnings bar an employee's eligibility to receive a full merit increase and impedes the ability for promotion. (Doc. #29, Exh. D at 83-84; Doc. #29, Exh. F at 118, 130). The bottom line of this controversy is this: Moore suffered from both attendance <u>and</u> performance problems and received a disciplinary warning. Milito had attendance issues but not performance problems, and did not receive a write up.

## II.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories,

and/or admissions on file – designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson v. Liberty Lobby, Inc.*, teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative."

*Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Analysis

Plaintiff alleges race discrimination (disparate treatment) under 42 U.S.C. § 1981/Title VII (Count I) and retaliation under 42 U.S.C. § 1981/Title VII (Count II).[7]  After a brief review of the substantive legal rules that apply to these claims, the court addresses them separately below.

A plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.[8]  *See Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).   Here, Plaintiff presents only circumstantial evidence of racial discrimination.  (*See generally* Doc. #32).  "In evaluating [discrimination] claims supported by

---

[7] Plaintiff concedes that there is no pattern or practice claim in this action.  (Doc. #32 at 29, n. 16).  With respect to her claims asserted here, the court notes that Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998).

[8] *See also McDonnell Douglas*, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." *Combs*, 106 F.3d at 1527.  Under the *McDonnell Douglas* and *Burdine* framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *See id.* at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation. *See, e.g., Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Lincoln v. Board of Regents of Univ. Sys.,* 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly. *See McDonnell Douglas*, 411 U.S. at 802 (hiring); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); *see also Nix*, 738 F.2d at 1185 (discipline); *Pittman v. Hattiesburg Mun. Separate Sch. Dist.,* 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[9] *See Rojas*, 285 F.3d at 1342; *Combs*, 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254-55; *see Chapman*, 229 F.3d at 1024.  If the employer

---

[9] *See Chapman*, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion).

satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[10]   Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, a plaintiff must rebut each of defendant's proffered reasons.  *See Chapman*, 229 F.3d at 1024-25.

Despite this shifting of the burden of production "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Burdine*, 450 U.S. at. 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim by proving that intentional discrimination did indeed motivate the defendant, and may defeat summary judgment by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000); *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *Combs*, 106 F.3d

---

[10] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  *Chapman*, 229 F.3d at 1030.

at 1529-38 (interpreting *Hicks* and the post-*Hicks* case law); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 920-21 (11th Cir. 1993).

### A. Plaintiff Has Failed to Establish a Prima Facie Case of Race Discrimination under 42 U.S.C. § 1981 and Title VII

The court now addresses Plaintiff's discrimination and retaliation claims, in turn. Plaintiff alleges that Von Maur treated her differently than similarly situated Caucasian employees and that her race was a substantial or motivating factor in Von Maur's decision to terminate her.  (Compl., ¶¶ 89, 90).   To establish a prima facie case for this claim, Plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside of her protected class or was treated less favorably than a similarly situated individual outside her protected class.  *Maynard v. Bd. of Regents*, 342 F.3d 1289 (11th Cir. 2003); *Hall v. Ala. Ass'n of Sch. Bds.*, 326 F.3d 1157, 116 (11th Cir. 2003).  For the purpose of summary judgment, the court assumes, but does not decide, that Plaintiff has established the first three prongs of the prima facie case.

To succeed on the fourth prong of the prima facie case, Plaintiff must produce evidence that Von Maur treated similarly situated, non-protected employees differently under the same or similar circumstances. [11]   *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Here, Plaintiff alleges that she was treated less favorably than Aileen Read and Melissa Patton, both white managers.[12]  (Doc. #32 at 30).

---

[11] On August 25, 2016, Defendants filed an Emergency Motion to Supplement the Evidentiary Record in Relation to its Motion for Summary Judgment (Doc. #34), arguing that Plaintiff identified, for the first time in opposition to the motion for summary judgment, two potentially similarly situated comparators.  Plaintiff responded that Defendant had notice, through deposition questioning, of the proposed comparators.  (Doc. #35).  The court allowed Defendants to supplement the record with the documentation, and both parties were permitted to file additional briefing.  (Doc. #36).

[12] In her initial Brief in Opposition to the Defendant's Motion for Summary Judgment, Plaintiff mentions, in a single sentence, her potential comparators.  "[S]he was treated less favorably than Aileen Read and Caitlin

In the work rules/discipline context, the Eleventh Circuit has adopted a test which requires a Plaintiff to show that her "comparator" is "similarly situated to the plaintiff in all relevant respects" and that the "quantity and quality of the comparator's misconduct must be nearly identical." *Stone & Webster Const., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012) (citations omitted). "We ask whether the comparator is involved in the same or similar conduct as the plaintiff yet disciplined in a different way." *Id.* That is, "[t]he comparator must be nearly identical to [Plaintiff] to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (citing *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001)).

Aileen Read, a Caucasian female, was a First Floor Manager at the Riverchase store from approximately May 2013 through April 2014. (Doc. #29, Exh. D at 140-43; Doc. #29, Exh. J at 10). Read reported to Keith Lockett and then Caitlin Harris during her tenure as First Floor Manager. (*Id.* at 10, 13). The "General Purpose" of a Floor Manager is to "take responsibility for all floor functions, operations, profitability, and customer service." (Doc. #38, Exh. P at Exh. 2). Among other duties, a Floor Manager is called upon to: directly supervise Department Managers and supervisory staff; conduct employee appraisals fairly and constructively; follow all disciplinary procedures when needed; and terminate employees when necessary. (*Id.*). Read agrees that a Floor Manager "trains employees" and "keeps on top of numbers and of sales goals of the floor." (Doc. #29, Exh. J at 10).

Read was never disciplined in her capacity as First Floor Manager. (*Id.* at 13). For her annual performance evaluation completed on March 11, 2014, Read was rated on a 5 point scale

---

Harris, white managers with documented sub-standard performance." (Doc. #32 at 30). However, in her sur-reply brief, Plaintiff argues that "[d]espite Aileen Read and Melissa Patton, white employees, having documented performance deficiencies, Defendant retained Ms. Read and Ms. Patton in its employment." (Doc. #39 at 1). The sur-reply goes on to argue *why* Plaintiff can be properly compared to Read and Patton, and does not mention Harris. (*See* Doc. #39). For this reason, the court herein considers only the possibility of Read and Patton being comparators.

(as opposed to Plaintiff's 3 point scale).  (Doc. #33, Exh. 15 at VM000386-VM000391).  Her review was signed by Melissa Patton and George LaMark.  (*Id.*; Doc. #29, Exh. J at 61).

Melissa Patton, a Caucasian female, began working as the Store Manager of the Riverchase store on or around February 10, 2014.  (Doc. #29, Exh. F at 137, 139).  According to the official position description, the "General Purpose" of a Store Manager is to "take[] ultimate responsibility for all store functions, operations, profitability, and customer service."  (Doc. #38, Exh. P at Exh. 1).  Among other duties, a Store Manager is called upon to: directly supervise floor managers, human resources managers and supervisory staff; administer customer service programs; conduct employee appraisals fairly and constructively; and interview and select new employees.  (*Id.*).  For her annual performance review dated October 2014, Patton was rated on a 5 point scale (again, as opposed to Plaintiff's 3 point scale).  (Doc. #33, Exh. 16 at VM000284).  Her "future objectives" were listed as "build a cohesive management team" and "hire quality staff."  (*Id.* at VM000288).  Patton's review was signed by George LaMark.  (*Id.*).

In stark contrast to Read and Patton, Plaintiff was, at all relevant times, the Cosmetic Department Manager at the Riverchase store.  (Doc. #29, Exh. B at 25-26; Doc. #29, Exh. D at 140-43).  According to the official position description, the "General Purpose" of a Store Manager is "[t]o develop and motivate department associates.  To develop the department's sales growth by monitoring and improving the department's level of customer service and visual presentation."  (Doc. #33, Exh. 11).  Among other things, a Department Manager is called upon to: provide excellent customer service; observe, assist, and motivate cosmetic associates in providing excellent customer service daily; set an example for others to follow; train cosmetic associates in application techniques, sales technique, product knowledge, and department and store policies and procedures as needed.  (*Id.*).

Given these vast differences in job responsibilities, Plaintiff's proffered comparators Read and Patton are far from "nearly identical" to herself. These three individuals held materially different job positions -- not just by name, but in terms of job duties, rank, and responsibilities. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011) ("If the same policies were applied differently to similarly ranked employees, those employees may be compared."). Even putting job titles aside, the lack of similarity between Plaintiff and her "comparators" is further evidenced by the fact that the very form of the performance review significantly differs when crossing job titles. While Read did receive a rating of "2" in some categories of her performance review, those ratings were given when she was new to her role. (Doc. #29, Exh. D at 220, 225-26, 232-38). But more critically, those ratings were on a completely different scale than Plaintiff's, with completely different criteria. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (plaintiff must show that he and his comparator are similarly situated in all relevant respects); *see also Adams v. Fairfield Southern Co.*, No. 2:14-cv-2295-RDP, 2016 WL 3745652 at *7 (N.D. Ala. July 13, 2016) (individuals in different jobs with different responsibilities and duties are not similarly situated); *Fletcher v. Supreme Beverage Co.*, No. 2:11-cv-0056-MHH, 2014 WL 5518294 at *9 (N.D. Ala. Oct. 31, 2014) ("The plaintiff's comparators must perform the same type of job tasks as the plaintiff.").

Because Read and Patton are simply not proper comparators with whom Plaintiff can establish a prima facie case of disparate treatment, summary judgment is due to be granted for Defendant as to Count I of the Complaint. In her initial Brief in Opposition to the Defendant's Motion for Summary Judgment, Plaintiff mentions, in a single sentence, that she "was replaced by someone outside of her protected class, Kristen Lowery." (Doc. #32 at 30). Plaintiff's Sur-Reply Brief in Opposition to the Defendant's Motion for Summary Judgment Responding to Defendant's Supplemental Evidence and Argument on the Propriety of Aileen Read and Melissa

[Patton] Serving as Comparators for Plaintiff's Race Discrimination Claim makes no mention whatsoever of Kristen Lowery.  (*See generally* Doc. #39).  For this reason, a comparison of Lowery and Abram is not explored herein.

Even assuming, *arguendo*, that Plaintiff had established a prima facie case of disparate treatment on the basis of race, her claim would nonetheless fail.  Defendant has articulated legitimate, non-discriminatory reasons for the termination of Plaintiff's employment.  (*See* Section I.B.3., *infra*).  The burden is then placed squarely back with Plaintiff to show that the proffered reasons for termination operated as a pretext for racial discrimination.  And for the reasons stated *infra*, Section III.B., Plaintiff cannot establish pretext.

Finally, the wholesale lack of similarity between Plaintiff on the one hand, and Read and Patton on the other, also is fatal to her pretext arguments as well.  (*See* Section III.B., *infra*).

## B. Plaintiff Has Failed to Establish a Prima Facie Case of Retaliation under 42 U.S.C. § 1981 and Title VII

Plaintiff's second allegation is that the termination of her employment from Von Maur was in retaliation for engaging in protected activity by complaining about "unfair and inequitable treatment and race discrimination."  (Compl., ¶ 93).   Specifically, Abram testified: "I believe that I was fired because I spoke up against this discrimination that had been practiced.  I stood up and said something, and I was fired. … The pinnacle came when I decided not to take part in this." (Doc. #29, Exh. B at 342, 344).

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice," including discrimination on the basis of race.  42 U.S.C. § 2000e-3(a).  The goal of these provisions is to "prevent[] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees," including freedom from race discrimination.

*Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53 (2006).  "An employee need not prove the underlying claim of discrimination for the retaliation claim to succeed."  *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999) (citations omitted).

To establish a prima facie case of retaliation, Plaintiff must show: (1) she engaged in protected activity or expression; (2) she suffered an adverse employment action; and (3) the adverse employment action was causally connected to the protected conduct.[13]  *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998); *see also Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989).  If Abram is able to advance a prima facie case of retaliation, the burden then shifts in accordance with *McDonnell Douglas* to Von Maur to articulate legitimate, non-discriminatory reasons for the alleged retaliatory acts.  *See Holifield*, 115 F.3d at 1566.  Upon the employer's successful articulation, for a claim to survive summary judgment, Plaintiff must demonstrate that the employer's proffered explanation operates as a pretextual ruse for retaliation.  *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (citation and internal quotation omitted).

### 1.    The Prima Facie Case of Retaliation

Von Maur argues that Abram cannot establish the first or third prong of the prima facie case.  (Doc. #29 at 26).  That is, Von Maur contends that Abram did not engage in statutorily protected activity and, in any event, her termination was not causally connected to any protected activity.  The court addresses these arguments, in turn.

### a.  Statutorily Protected Activity

Plaintiff's argument that she engaged in statutorily protected activity is moored in her communication to Melissa Patton and Aileen Read that she opposed writing up Sandy Moore (African American) for attendance issues without also writing up Maria Milito (Caucasian) for

---

[13] The elements required to establish retaliation claims under § 1981 are the same as those required for Title VII claims.  *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

similar concerns.  (Doc. #32 at 19).  In order for this communication to satisfy the standard of protected activity, Plaintiff is not required to show that the conduct was actually discriminatory; she need only establish that she believed, in good faith, that the conduct violated the law and that this belief was objectively reasonable in light of the facts and the law.  *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 1209, 1213 (11th Cir. 2008); *see also Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008).  That is, the complained-of conduct must be such that it would adversely affect the terms and conditions of her or others' employment – mere unfair treatment is not enough.  *See Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010); *Davis v. Town of Lake Park*, 245 F.3d 1239 (11th Cir. 2001) ("[T]he asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.").

After careful review, the court concludes that from both a subjective and objective standard, Plaintiff has not raised enough of an issue of fact to satisfy this prong of the prima facie case.  From her training with Von Maur, Abram had learned that a manager's role is to administer policies consistently and hold all associates to the same standard.  (Doc. #33, Exh. 2, Manager Training Materials).  But the specifics of the CSIP ("Customer Service Improvement Plan") seem to have confused Plaintiff.  The CSIP contains several markers.  One is a selling statistic, or "sales percentage to goal. … Comparing the associate's performance to the department average indicates whether or not they are below average, average, or above average in all categories."  (Doc. #29, Exh. A at Exh. 7, VM000577).  Another is the attendance statistic.  (*Id.* at VM000578).  Days absent and days tardy are all documented on the CSIP.  (*Id.* at VM000579).  The CSIP is the document that combines several areas of review into a single document.  (Doc. #29, Exh. A at Exhs. 5, 6).

Plaintiff alleges that she was directed to review four CSIP periods to determine the amount of tardies accrued by Moore and Milito.[14]   (Doc. #29, Exh. B at 299-300, 306). Comparing those four total CSIP periods, Moore had 15 tardies and Milito had 20.  (*Id.* at 299-300; Pl. Exhs. 18, 19).   For the most recent CSIP periods applicable to those same two employees, each had 6 tardies.  (*Id.*).   In her brief, Plaintiff's characterization of these events is that she was told to write-up Moore, but not Milito, for attendance issues.[15]  (Doc. #32 at 20, n.10).  But this is not precisely what occurred, even based on Plaintiff's own testimony.[16]  In fact, Plaintiff's testimony as to *why* she was told to discipline Moore and not Militio seems to shift on a few occasions throughout her deposition.

> Q:  Okay.  And that – and my understanding of your complaint is that you believe that Ms. Moore – you were directed to discipline her for attendance and you were not directed to discipline Ms. Milito for what you believe to be the same attendance issues, correct?
> A:  More egregious, yes ma'am.

(Doc. #29, Exh. B at 272).

> Q:  No, no, I understand that.  You were told to write her up for attendance, correct?
> A:  Yes ma'am.

(*Id.* at 273).

> Q:  Okay.  So let me ask you a question.  Did you end up writing up Ms. Moore?
> A:  Yes, I did.
> Q:  And for what?  Attendance?

---

[14] Von Maur's CSIP form suggests that it is not the usual practice to compare across differing CSIP periods.  (Doc. #29, Exh. A at Exh. 7).  Because this is a disputed fact, it is stated in the manner most favorable to Plaintiff, as is the summary judgment standard.

[15] Read testified that Moore warranted discipline because "Sandy [Moore] fell 54 percent to the sales goal in the department in regards to what she actually sold, and then in addition we had those concerns with tardies." (Doc. #29, Exh. J at 96).  Moore had 6 tardies for the time period of January 5 through February 1.  Milito had the same amount of tardies on her CSIP form, but not the same deficient sales.  (*Id.* at 96-97).  Lockett also testified: "I do remember explaining to Felicia [Abram] that we were not writing up Sandy [Moore] because of attendance, it was because of sales."  (Doc. #29, Exh. K at 62).

[16] But this may be a confusion that has persisted since before her termination.  Lockett testified that Plaintiff "was confused" as to why Moore was disciplined.  "I think she was very caught up on the fact that it was because of tardies, and it was not because of tardies."  (Doc. #29, Exh. K at 63).

A:  I believe there were a couple of things on the CSIP that she had not met, and my concern at that time was that there were others who fell in these categories as well and that if I'm going to do it for one, I should be writing everybody in that category up.

(*Id.* at 276).

Regardless of the "why," Plaintiff approached Patton, and told her: "I honestly feel like there is no way that somebody is going to make me write up one person over another person.  I said and the only difference that I can see is one is black and one is white. … [I] was not comfortable putting [my] name on the bottom of a write-up that was not administered in a fair manner."  (*Id.* at 275, 285).[17]  "I told them that I did not agree with it, that it could be a litigious situation for us.  And those were my words to Ms. Patton. … They are going to collect data and compare notes.  This could be a potential lawsuit for us.  No, it's not.  That's what she said."  (*Id.* at 341).  Patton went on to tell Plaintiff that she was aware that several people fell below the standard on the last CSIP, but that Moore was the lowest.  (*Id.* at 282-83).  Here, Plaintiff readily admits that Patton was telling her to write up "Sandy [Moore] for her time *and* attendance and for her falling below the dollar amount, okay, for sales."[18]  (*Id.* at 289, 300, 304 (emphasis added); Doc. #29, Exh. F at 126).[19]

---

[17] These facts are stated in the light most favorable to Plaintiff.  Patton testified that Plaintiff voiced no concerns whatsoever to her about the discipline being unfair or racially discriminatory.  (Doc. #29, Exh. F at 129; Doc. #29, Exh. O ¶ 5).

[18] Melissa Patton similarly testified that Moore received the disciplinary warning "[b]ecause it's not only sales performance that was deficient.  It was also attendance, so it was overall."  (Doc. #29, Exh. F at 132).

[19] Plaintiff readily admits that falling below CSIP goals could mean an attendance issue, or a sales issue, or both.  "I'm talking about writing up people who fall below, which means it doesn't matter if it was an attendance issue for this month or whether they fell below because of their dollars or the money they were supposed to make this month.  If you are not doing what you are supposed to be doing, everybody should get a write-up.  And it didn't matter to me if it was about your attendance or about you sitting around like this (demonstrating) in a black cloud with everybody wearing black talking while customers are in the department and you are not servicing them."  (Doc. #29, Exh. B at 305).

To be fair, writing up Moore for deficiencies in both attendance and sales also seems to have concerned Plaintiff. Although it was common practice to adjust the sales goal downward at the end of the month, Plaintiff believed this to be error as well.

> And I said well, wait a minute, everybody fell below the CSIP and everybody fell below, with the exception of one or two, with time and attendance. … What they done is they took the actual numbers for the month and they converted the numbers and made the goals backdated, made the goal where everyone else fell in. The only person who I remember, because there could have been more, but I know for sure that fell below was Sandy. And that concerned me. Because I feel like if we are going to give a goal, let the goal be the goal. If you didn't make it, you didn't make it, I felt. But you certainly don't say your goal at the top of the month on May 1st is two thousand dollars and on May 30th, at the end of the month, you say well, it's seven hundred last month. Now I have got to reconfigure everything and give you a lower goal when you knew your – so everybody fell below was my point. Why am I changing it for just one person?

> So they asked me what did I want to do. I said I want to write everybody up. Everybody who fell below needs to be written up. It's the only fair and equitable thing to do.

(Doc. #29, Exh. B at 289-90, 304).[20] In response, Patton told Plaintiff to write up everyone who fell below CSIP goals. (*Id.* at 291). Plaintiff did so, creating write-ups for Militio and Carmen Lowe. (*Id.* at 303, 338). Her desire was to write people up for whatever category they were deficient in for a CSIP period. (*Id.* at 295).

Given this set of facts, there is no way Plaintiff could have subjectively believed that she was opposing unlawful discrimination. She herself testified that Moore fell below the adjusted sales goals *and* had numerous tardies. (*Id.* at 300-301; Doc. #29, Exh. J at Exhs. 8, 9). Plaintiff knew that Moore had the lowest sales performance for the relevant CSIP period and that Milito's sales performance was better than Moore's. (Doc. #29, Exh. B at 300-01; Doc. #29, Exh. J at Exhs. 8, 9). Because Plaintiff knew that she was writing Moore up for a combination of factors, and Moore was indeed the most deficient with respect to the combination of these two

---

[20] Plaintiff does not remember whether (and thus cannot dispute that), once the sales goals were adjusted, Moore was the only one who fell below the adjusted goal. (Doc. #29, Exh. B at 294, 296).

categories, she could not have subjectively believed that she was complaining about discrimination on the basis of race.  That the write-up *could have been* discriminatory, *if* it was based solely on attendance, is no answer because that is not nearly enough for Plaintiff to have a good faith belief that she was complaining about discrimination.  *See Tatt v. Atlanta Gas Co.*, 138 Fed. Appx. 145, 148-49 (11th Cir. May 11, 2005) (on a sexual harassment claim, finding that just because acts and/or comments may relate to a body part, *i.e.* "pull on some long necks," does not make them sexual in nature); *see also Combs*, 106 F.3d at 1543 (finding that although a decision may "seem to some to be bad business judgment, and to others to be good business judgment, … federal courts do not sit to second-guess the business judgment of employers. Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer.").

But even assuming, *arguendo*, that Plaintiff subjectively believed she was complaining of unlawful discrimination, the controlling substantive law must be considered to assess whether that mistaken belief was objectively reasonable.  *See Harper v. Blockbuster Entm't Corp.,* 139 F.3d 1385, 1388 & n. 2 (11th Cir.1998) (examining the objective reasonableness of an employee's belief that an employment practice is unlawful in light of existing substantive law). "Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of this Court or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable."  *See id.* at 1388–89.  That is, when the merits of the underlying claim are doubtful, the plaintiff must be able to point to some "statutory [language] or case law that can reasonably be believed" to support her understanding. *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 857 (11th Cir. 2010); *see also Knott v. DeKalb Cty. Sch. Sys.*,

624 Fed.Appx. 996, 998 (11th Cir. 2015) (per curiam) (citing to *Dixon* to affirm district court's dismissal of retaliation claim that was premised on initial report of sex discrimination, which no case law could reasonably be construed to support).  Here, "by a country mile" it was not. *Clover v. Total Sys. Services, Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999).  (*See* Doc. #32 at 20-21).  There is simply no authority to support the contention that an employer cannot discipline the lowest performing individual by looking at the totality of a performance review.  *See, e.g. Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) (finding that it is not for courts to judge whether an employer's decisions are prudent or fair, but, instead, whether they were motivated by an unlawful animus); *Jones v. Bellsouth Communications, LLC*, No. CV-11-BE-3852-S, 2013 WL 4482607 at *2, (N.D. Ala. Aug. 19, 2013) (where employer's performance measurement plan combined performance areas into a composite score, was legitimate, non-retaliatory reason for discharge); *Florence v. Novo Nordisk*, 569 Fed. Appx. 906, 910 (11th Cir. June 25, 2014) (finding that plaintiff had low calls, poor administrative efficiency, and poor Blackberry use and therefore was not discriminated against).  Perhaps, if Plaintiff had been the one in charge of how to handle questions surrounding write-ups, she could have chosen – as a matter of managerial protocol – to write up Milito for attendance and Moore for both attendance and sales performance.  But Von Maur's decision to write up Moore – and Moore alone – based upon a totality of the circumstances does not give rise to an objectively reasonable basis for believing the company was discriminating.[21]

Because Plaintiff did not engage in statutorily protected activity, her prima facie case of retaliation fails.

---

[21] Here, the prima facie case and the consideration of pretext overlap to some degree.  This is not unusual. It is well established that courts are not to sit as super-personnel departments to determine "best" business practices. *Combs*, 106 F.3d at 1541-43.  Because it is well settled that courts do not second-guess employers, Plaintiff could not have objectively believed that she was complaining of discrimination simply because she did not agree with the method in which Von Maur used to write-up its employees.

### b.  Causal Connection

In the interest of completeness, the court recognizes that, assuming that Plaintiff had established that she engaged in statutorily protected activity (and, to be clear, she has not), her prima facie case of retaliation may meet the Eleventh Circuit's temporal test.  "In order to establish the requisite 'causal link' required as part of a *prima facie* case, a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated.'" *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *see also Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  A substantial delay between the protected activity and the negative employment action, where there is no other evidence of causation, is insufficient to establish a causal connection.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).  Conversely, "[a] plaintiff may satisfy her burden of proving causation by demonstrating a 'close temporal proximity between the statutorily protected activity and the adverse employment action.'" *Luke v. Bd. of Trustees Florida A&M Univ.*, -- Fed. Appx. --, 2016 WL 7404677 at *3 (11th Cir. Dec. 22, 2016) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).  However, while close temporal proximity can be effective to raise an inference of causation, if this is the only basis of causation, "the actions must be very close in time." *United States ex rel. Salters v. American Family Care, Inc.*, Slip Copy, No. 5:10-cv-2843, 2016 WL 7242180 at *6 (N.D. Ala. Dec. 15, 2016) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

Here, Plaintiff complained to Patton about unfair write-ups in late February 2014.[22]  (Doc. #29, Exh. B at 274-75).  Approximately three to four weeks later, on or about March 25, 2014, Plaintiff's employment with Von Maur was terminated.  (*Id.* at 15).  In the Eleventh Circuit, this

---

[22] This disputed fact is stated in the manner most favorable to Plaintiff.  Patton testified that Plaintiff voiced no concerns to her about the discipline being unfair or racially discriminatory.  (Doc. #29, Exh. F at 129; Doc. #29, Exh. O at ¶ 5).

timeframe falls into somewhat of a gray area.  Where temporal proximity is the only basis for causation, "a delay of three to four months is too long, as a matter of law, to establish causation by temporal proximity."  *Baroudi v. Sec'y, U.S. Dept. of Veteran's Affairs*, 616 Fed. Appx. 899, 902 (11th Cir. 2015) (per curiam) (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).  However, the Eleventh Circuit has found that seven weeks is "sufficiently proximate to create a causal nexus."  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999).  Therefore, assuming *arguendo* that Plaintiff has established a causal connection, the court will consider the retaliation evidence presented on pretext.[23]

## C.      The Lack of Pretextual Evidence[24]

Even if Plaintiff had established a prima facie case of discrimination and/or retaliation, her claim would nonetheless fail.  Von Maur has articulated legitimate, non-discriminatory reasons for terminating Plaintiff's employment.  (*See* Section I.B.3.).  The ultimate burden is on Plaintiff to prove by a preponderance of the evidence that the reasons provided by Von Maur are pretext for prohibited, retaliatory conduct.  *Trask v. Sec'y Dep't of Veteran's Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016).  To establish pretext, a plaintiff cannot recast the proffered reason, but must meet it head on and rebut it.  *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012).  The plaintiff must show "weaknesses, implausibilties, inconsistencies, incoherencies, or contradictions in the employer's rationale."  *Id.* at 1055-56 (quotation omitted).  This court is not

---

[23] The court is unaware of any authority establishing that where the prima facie case has been successfully rebutted, the temporal closeness between the protected activity and the adverse action is sufficient on its own to sustain a pretext finding.  Certainly Plaintiff does not make that argument in her brief in opposition to summary judgment.  (*See generally* Doc. #32).  Regardless, the prima facie case fails on the first prong, as explained above, because Plaintiff did not engage in statutorily protected activity.

[24] The court recognizes that, although it is often found to be useful, the *McDonnell Douglas* framework "is not the exclusive means" of prevailing on a Title VII claim based on circumstantial evidence. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n. 3 (11th Cir.2005). A plaintiff's claim will also survive summary judgment if she otherwise presents "enough circumstantial evidence to raise a reasonable inference" that an adverse action was taken against her in violation of Title VII. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). Thorough examination of all of the circumstantial evidence presented in this case, however, reveals that no reasonable inference of discrimination or retaliation can be raised in this case.

to judge whether an employer's decision is "prudent and fair" but only whether an unlawful discriminatory animus motivated an employment decision. *Damon v. Fleming Supermarkets of Fl., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).   The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs or "reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atlantic Developers, Inc.,* 610 F.3d 1253, 1266 (11th Cir. 2010). If the reason is one that might motivate a reasonable employer, the plaintiff cannot succeed by simply quarrelling with the wisdom of the reason. *Id*. at 1265–66. Additional, but undisclosed, non-discriminatory reasons for the employment action which are not inconsistent do not necessarily demonstrate pretext. *Tidwell v. Carter Prod*., 135 F.3d 1422, 1428 (11th Cir. 1998). Similarly, differing reasons that are not necessarily inconsistent do not show pretext. *Zaben v. Air Prod. & Chemicals, Inc*., 129 F.3d 1453, 1458–59 (11th Cir. 1997).

Plaintiff travels down three avenues in support of her argument that she has established pretext: (1) her performance history prior to her complaints; (2) Von Maur's deviation from its documentation policy; and (3) comparative treatment of substandard performance.  (Doc. #32 at 24-29).  Each of these is considered, in turn, but ultimately they each fail to establish that Von Maur's articulated reasons for Plaintiff's termination are pretextual.

### a.   Performance History

Plaintiff argues that up until the moment of the termination of her employment, her performance was "met with praise" during her tenure at Von Maur.  (Doc. #32 at 25).  While at the Alpharetta store, she received two raises and "fully meets expectations" ratings on her August 2013 performance review.  (Doc. #33, Exh. 1 at 2).  When she re-located from Alpharetta to Birmingham, Plaintiff continued to receive pay raises and a "fully meets expectations" performance review.  (Doc. #32 at 26).  Plaintiff argues that this is sufficient to establish pretext

31

because eighteen days after the "fully meets expectations" review, Plaintiff's employment with the company was terminated.  (*Id.* at 25-26; Doc. #33, Exh. 1 at 2).

However, the contention that Plaintiff had no idea that Von Maur had concerns with her performance is belied by the undisputed evidence in the Rule 56 record.  While she denies having "conversations" with her superiors about her management style, she qualifies that by saying "we hadn't had any conversations other than little he said, she said stuff.  Well, this one said this and this one feels that."  (Doc. #29, Exh. B at 367-68).  From the time that Plaintiff took part in initial training for opening the new Riverchase store, Plaintiff was given feedback that she needed to "tone it down" and "not be so direct" with subordinates.  (Doc. #29, Exh. K at 48).  Rosemary Goodwell resigned her employment with Von Maur in November 2013, citing Plaintiff's management style as one reason.  (Doc. #29, Exh. I at 27, 32-33).  Harris and Read met with Plaintiff after Goodwell's resignation.  (Doc. #29, Exh. F at Exh. 37).  Plaintiff admits that Harris and Read "told me that she quit because of me" and that "they said we talked to [Goodwell] and she said that you were micromanaging her and that she had not been trained."  (Doc. #29, Exh. B at 80-81).  Plaintiff counters that "[Goodwell's] complaints were very unfounded and that they hired the wrong individual for a job that she could not do," and argues that "Rosemary left that job because she … had not been disciplined for kicking me."  (*Id.* at 368).

Even considering those instances in which Plaintiff denies that she was informed of complaints lodged against her or of issues with her performance, there is no dispute in the record that, as far as Lockett, Harris, McIntosh, Read, Patton, and LaMark were concerned, there existed on-going issues with Plaintiff's performance from the very inception of her career at the Riverchase store.  (Doc. #29, Exh. K at 48) (encouraging Plaintiff to "tone it down" and "not be so direct"); (Doc. #29, Exh. E at 41-44, 51, 56-57) (personally observing Plaintiff

micromanaging her staff, including rearranging their stock, making them nervous about displaying product, and refusing to allow them to independently obtain their sales numbers); (Doc. #29, Exh. H at 50) (hearing complaints that Plaintiff micromanaged the department, failed to create and foster an atmosphere of teamwork, and rushed training); (Doc. #29, Exh. F at 145, 154, 258-59) (noting that Read had to be present in Plaintiff's department to ensure that it ran smoothly and taking complaints from co-employees that Plaintiff was spreading rumors); (Doc. #29, Exh. D at 200) (addressing continuing issues with Plaintiff and that things were not improving).  This is not a case where there is "an absence of supporting documents" for the termination decision.  *See Wascura v. City of S. Miami*, 257 F.3d 1238, 1245 (11th Cir. 2001) (noting that where a history of poor performance or misconduct is articulated, an absence of supporting documents, where it would be expected, can establish pretext); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (whether plaintiff was guilty of co-worker's allegations was irrelevant, as the court "can assume for purposes of this opinion that the complaining employees [] were lying through their teeth" because "the inquiry [] is limited to whether [the decision makers] believed that [plaintiff] was guilty of [the alleged behavior]"). Plaintiff has presented no evidence that Von Maur did not believe in good faith that Plaintiff's performance suffered from the identified deficiencies.  As such, Plaintiff has not shown that Von Maur's articulated, non-discriminatory reasons for the termination decision were false or that discrimination or retaliation was the real reason for the termination.  *See Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).  Plaintiff's pretext argument in this area fails.

### b.  Deviation from Documentation Policy

Plaintiff argues that Von Maur failed to follow its documentation policy, termination policy, and management training by not giving her at least two disciplinary warnings prior to

termination.  (*See* Doc. #32 at 28).  In fact, the Store Manager EEO Training given in February 2013 explains that the goal of documentation is to "create a record of facts and the steps and actions taken; it serves as evidence of the business reason for actions taken."  (Doc. #33, Exh. 6 at 8).  The Management Training Employment Policies presentation of April 2014 explains that proper documentation "substantiates employer's actions/evidence of lawful motive/establishes of consistent treatment."  (Doc. #33, Exh. 7 at VM000765).  The termination policy states that for an employee with one to three years of service or less, there "should" be "at least two disciplinary warnings prior to termination."  (*Id.*)

A written progressive discipline policy also exists.  (Doc. #33, Exh. 5).  That policy explains three steps in the counseling process:  Coaching, Warning, and Termination.  (*Id.* at VM001151).  However, the policy also states that "[t]hese are general disciplinary guidelines. Depending on the nature of the concern, some situations will not follow these steps."  (*Id.*).

The Eleventh Circuit has indicated that circumstances may exist where an employee can establish pretext by demonstrating an employer's failure to follow a progressive discipline policy.  *See Ritchie v. Indus. Steel, Inc.,* 426 Fed.Appx. 867, 873 (11th Cir.2011); *see also Morrison v. Booth,* 763 F.2d 1366, 1374 (11th Cir.1985) ("Departures from normal procedures may be suggestive of discrimination.").  An employer's failure to follow that policy, however, does not show pretext "if management has discretion as to whether to follow the discipline policy." *Ritchie,* 426 Fed.Appx. at 873; *see also Mitchell v. USBI Co.,* 186 F.3d 1352, 1355–56 (11th Cir.1999) ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus."); *Austin v. City of Montgomery*, No. 2:04-cv-420, 2005 WL 6128989 at *8 (M.D. Ala. June 29, 2005) ("First, [plaintiff] failed to show that the progressive discipline policy was mandatory under the circumstances.  Second, [plaintiff] does not show other

instances in which similarly situated employees outside her protected group were treated differently.").  And Von Maur's policy clearly states that the guidelines are, in fact, guidelines.

> Von Maur has established general guidelines to govern the conduct of its employees. This guideline does not include all instances of conduct that can result in disciplinary action.  Von Maur reserves the right to determine the appropriate level of discipline for any performance concern or inappropriate conduct based on the individual situation. However, all employees of Von Maur are at will and therefore may be discharged without cause.

(Doc. #33, Exh. 5 at VM001165).  Aside from putting into evidence seven written disciplinary warnings given to individuals at stores other than Riverchase, Plaintiff has done nothing to establish that Von Maur followed its progressive discipline policy in all circumstances except in terminating Plaintiff.  (Doc. #33, Exh. 4 at VM000678-VM000684).  Although it is "reasonable" to expect that performance deficiencies are noted in a performance review (Doc. #29, Exh. D at 78),[25] this does not happen in all cases because that policy is "a guideline, so it's a structure" to be used with "discretion."  (Doc. #29, Exh. F at 218-20).

For this reason, and because no other evidence exists to allow a reasonable inference of discrimination or retaliation, Plaintiff's claims fail.

### c.  Comparative Treatment of Substandard Performance

Plaintiff's final pretext argument is rooted in comparative evidence.  She argues that Defendant tolerated "employees with documented sub-standard performance, when those employees had not complained of discrimination, which terminating Ms. Abram whose performance was documented as meeting expectations would further allow a jury to conclude that Defendant's assertion it terminated Ms. Abram for performance was a pretext for

---

[25] And, in fact, deficiencies were noted on Plaintiff's performance review of March 7, 2014.  Plaintiff was rated "does not meet expectations" in the categories of department sales performance and policies and procedures. (Doc. #29, Exh. J at Exh. 4).  Plaintiff was given three goals to work on: "(1) Communicate information and goals to associates in a positive and professional manner; (2) Take positive action to build/maintain department morale; accept constructive performance feedback and use to improve; and (3) Arrive to work on time for all scheduled shifts and maintain good attendance."  (Doc. #29, Exh. J at Exh. 4, VM000088).

retaliation." (Doc. #32 at 29).  But as noted in detail above, Plaintiff has no viable comparators. (*See* Section III.A., *supra*).  Therefore, this pretext argument also fails.

**IV.     Conclusion**

Upon careful consideration of the Rule 56 briefing and undisputed evidence, the court finds that Defendant's Motion for Summary Judgment (Doc. #28) is due to be granted.  A separate order will be entered consistent with this Memorandum Opinion.

DONE and ORDERED this January 31, 2017.

_____
R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE